Ray MARSHALL, Secretary of Labor, U. S. Department of Labor, Plaintiff–Appellee,

v.

Elden WAIT, Trading and d/b/a Elden Wait, Greenstone Quarry, Defendant–Appellant.

No. 78–2345.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 1980.

Decided Sept. 29, 1980.

J. Michael Cochrane, Cooper, Taylor & Sands, Sacramento, Cal., argued for defendant–appellant; Martin B. Brifman, Sacramento, Cal., on brief.

Douglas N. Letter, Washington, D. C., argued for plaintiff–appellee; William Kanter, Washington, D. C., on brief.

Before MERRILL, Senior Circuit Judge, GOODWIN and ANDERSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Wait appeals the granting of a permanent injunction against, *inter alia*, interference with the inspection of his quarry by representatives of the Secretary of Labor under the provisions of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801, *et seq.* (hereafter "the 1977 Act"). The issuance of injunctions to prevent interference with mine safety inspections is authorized by 30 U.S.C. § 818. We reverse.

Wait operates a rock quarry located in Amador County, California. The quarry, which has been in Wait's family since around the turn of the century, produces approximately 1,500 tons of decorative rock per year. Wait and his wife work the quarry with no employees. All of the rock produced is sold on the quarry premises to distributors who market the rock elsewhere in California.

On September 15, 1977, two representatives of the Secretary of the Interior approached Wait's quarry and attempted to enter it for the purpose of making a safety inspection pursuant to the Federal Metal and Nonmetallic Mine Safety Act of 1966, formerly 30 U.S.C. § 723 (1970), *et seq.* Although it is unclear whether the representatives properly identified themselves and their mission, it is clear that Wait refused to allow them to enter either the quarry or the production area. On January 5, 1978, the Secretary of the Interior filed his complaint seeking injunctive relief against any interference with entry of his authorized representatives upon Wait's quarry and against any refusal to permit inspection of the mine. The Secretary of Labor was later substituted as the plaintiff under the terms of the 1977 Act. 30 U.S.C. § 961(c)(4).

On May 9, 1978, the district court entered a permanent injunction which prohibited Wait from refusing to admit authorized representatives of the Secretary to the quarry, from refusing to permit inspection

of the quarry, and from interfering with, hindering or delaying the Secretary or his representatives in carrying out their duties under the 1977 Act. At least one inspection has occurred under the provisions of the injunction, and penalties for safety violations have been assessed.

██ Wait resisted the injunction primarily on the ground that the authorization of warrantless searches under both the 1966 and 1977 Acts violated his right to be free from unreasonable search and seizure under the fourth amendment. The district court found, however, that a warrantless search was justified because Wait was involved in a "pervasively regulated industry." *See United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). We disagree with the district court that Wait's quarry is a component of a "pervasively regulated industry" and find that Wait could have a reasonable expectation of privacy in his quarry operation.[1]

The facial validity of the warrantless inspection procedure authorized by 30 U.S.C. § 813 has been upheld by several of our sister circuits. *See Marshall v. Sink*, 614 F.2d 37 (4th Cir. 1980); *Marshall v. Texoline Co.*, 612 F.2d 935 (5th Cir. 1980); *Marshall v. Nolichuckey Sand Company, Inc.*, 606 F.2d 693 (6th Cir. 1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980); *Marshall v. Stoudt's Ferry Preparation Company*, 602 F.2d 589 (3d Cir. 1979), *cert. denied*, 444 U.S. 1815, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *see also, Marshall v. Cedar Lake Sand and Gravel Company*, 480 F.Supp. 171 (E.D.Wis.1979); *Marshall v. Donofrio*, 465 F.Supp. 838 (E.D.Pa. 1978), *aff'd without opinion*, 605 F.2d 1196 (3d Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); *cf., Youghiogheny and Ohio Coal Company v. Morton*, 364 F.Supp. 45 (S.D.Ohio 1973). These decisions have generally examined the 1977 Act under the standards established for judging the constitutionality of warrantless administrative inspections in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). Each follows basically a similar analysis, which may be summarized as follows:

1. Because mining in general, and coal mining in particular, has been subject to pervasive federal regulation, the proprietor of a mine has no reasonable expectation of privacy in the mine, applying the *Biswell–Colonnade* rationale;

2. The inspection scheme of the 1977 Act covers only a single industry, in contrast with the Occupational Safety and Health Act;

3. Urgent federal interests are served by the promotion of safety in the coal mining industry, especially in light of the energy crisis;

4. The 1977 Act leaves less room for governmental abuse than did the OSHA warrantless inspection provisions, because it is more specific as to the timing and purposes of inspections;[2]

5. Imposition of a warrant requirement would hamper the inspection process; and

---

1. Our consideration of the constitutionality of the 1977 Act's warrantless inspection provision as applied to Wait's operation does not contravene the time–honored principle that the jurisdiction of an administrative agency is to be determined in the first instance by the agency. *See, e. g., Marshall v. Able Contractors, Inc.*, 573 F.2d 1055 (9th Cir.), *cert. denied*, 439 U.S. 826, 99 S.Ct. 98, 58 L.Ed.2d 119 (1978). We do not question whether the Secretary has jurisdiction to inspect the mine for safety violations. Indeed, Wait has not seriously questioned the statutory jurisdiction of the Secretary on this appeal. *See, infra.* We merely pass on the constitutionality of the inspection procedure, a

task which is unquestionably committed to the federal judiciary.

2. 30 U.S.C. § 813(a) provides that the Secretary shall make inspections of each underground mine at least four times a year, and of each surface mine at least twice a year. The Secretary is required to develop guidelines for additional inspections, based on such criteria as hazards actually found during inspections and the Secretary's experience under the 1977 Act and other health and safety laws. § 813(i) authorizes frequent spot inspections under certain specified circumstances.

6. The injunctive relief provision allows for a judicial determination of reasonableness prior to inspection.

While each of these factors arguably militates in favor of the facial constitutional validity of the 1977 Act's inspection scheme, a question which we expressly reserve, the warrantless inspection of Wait's quarry is nonetheless inconsistent with the fourth amendment.

Wait's operation comes within the purview of the 1977 Act only because of the Act's expansive definition of the term "mine," which includes, in part, ". . . an area of land from which minerals are extracted in nonliquid form . . . ." 30 U.S.C. § 802(h)(1)(A). A rock quarry is clearly within this definition. Because the 1977 Act takes such a broad view of mining operations, a great many types of operations are within the Secretary's jurisdiction. Prior to 1966, however, federal mine safety provisions applied only to coal mines. It was only with the passage of the Metallic and Nonmetallic Mine Safety Act that year that other excavation–related industries such as sand and gravel producers became subject to federal safety inspections. *See Marshall v. Nolichuckey Sand Co., supra,* at 695. Prior to 1966, the nation's coal mine operators had long been the target of federal safety laws, though enforcement provisions were not always adequate. *See* Senate Report No. 95–181, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News, p. 3401. Consequently, the 1966 Act brought within its umbrella of protection both industries which had been traditional objects of federal scrutiny and others which were relative newcomers to the concept of federal regulation.

■ An industry's history of regulation is a relevant factor in determining the constitutionality of subjecting its operators to nonconsensual warrantless searches; for some it is the critical factor. *See, e. g., Colonnade Catering Corp. v. United States, supra* (liquor industry); *United States v. Raub,* slip op. p. 3332 (9th Cir. May 22, 1980). Of perhaps equal importance is the pervasiveness of federal regulation and the public interest in enforcement. As the Supreme Court noted in upholding a warrantless inspection of a pawn shop operator federally licensed to deal in sporting weapons:

> "Federal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry, but close scrutiny of this traffic is undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders. . . . Large interests are at stake, and inspection is a crucial part of the regulatory scheme, since it assures that weapons are distributed through regular channels and in a traceable manner and makes possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms."

*United States v. Biswell, supra,* 406 U.S. at 315, 316, 92 S.Ct. at 1596.

■ The rationale of the *Biswell–Colonnade* doctrine relates back to our fundamental inquiry in all fourth amendment cases: the individual's reasonable expectation of privacy. An individual who enters into a particular industry is put on notice of the likelihood of unannounced nonconsensual warrantless inspections by both the history and degree of regulation. By accepting the benefits of the trade, the entrepreneur also accepts the burden of regulation and thereby consents to the necessity of inspection. *See Almeida–Sanchez v. United States,* 413 U.S. 266, 270, 271, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Consequently, there can be no reasonable expectation of privacy, at least as to administrative inspections.

Warrantless inspections of non–coal mining operations under the 1977 Act have been upheld on *Biswell–Colonnade* grounds. In both *Marshall v. Texoline Co., supra,* and *Marshall v. Nolichuckey Sand Co., supra,* warrantless inspections of open gravel pits were approved. *See also Marshall v. Cedar Lake Sand & Gravel, supra.* In *Marshall v. Stoudt's Ferry Preparation Co., supra,* a preparation plant which separated low-grade fule from sand and gravel dredged

from a riverbed was held to be constitutionally subject to warrantless inspections. In bringing the sand and gravel operation in *Texoline* within the "pervasively regulated industry" exception, the court there noted that:

"Although the sand and gravel industry does not have the long history of regulation found in the coal mining industry, Congress clearly found that sand and gravel excavations could be almost as dangerous as underground coal mines and consequently in need of similar supervision. . . . Because Congress found that all miners are exposed to unusually severe health and safety hazards, all mining is now pervasively regulated, at least with respect to health and safety measures."

612 F.2d at 938.

We cannot apply such reasoning to Wait's operation. The excavation of decorative rock is an industry sitting on the fringe of traditional mining operations. Unlike the pawn shop operator in *Biswell*, Wait is not subject to the type of licensing and reporting requirements which place some business proprietors on almost daily notice of extensive federal oversight. Furthermore, Wait and his wife operate the quarry and market their product without the assistance of employees. While we do not mean to imply that small, owner–operated mines can never be subject to warrantless inspections, *see Marshall v. Sink, supra,* we find that the absence of paid employees is a factor to consider in determining an operator's reasonable expectation of privacy.[3] To emphasize, Wait did not enter a pervasively or traditionally regulated business and thereby subject himself to government supervision and regulation. *United States v. Raub, supra* at slip op. p. 3336. It

would be far more accurate to state that this legislation and regulations adopted pursuant thereto "entered" Wait's business activity in the very recent past and many decades after its establishment. Under this combination of circumstances, we hold that Wait has not impliedly consented to warrantless inspections of his small, family–owned and operated quarry.[4] To the extent that out analysis differs from cases cited above, we respectfully disagree with them.

The unbridled discretion of enforcement and compliance officers in the field, in this case, are as offensive to the general constitutional requirement that a search warrant be obtained as was found to be the case in *Marshall v. Barlow's*, 436 U.S. at 322–324, 98 S.Ct. at 1825–1826. *See also See v. Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (holding that the Warrant Clause applies to regulatory inspections). While we accord Congress great deference in matters within its constitutional competency, we cannot allow it to determine by statutory definition the privacy expectations of American citizens. It is the duty of this court to preserve the constitutional values embodied in the Bill of Rights. In this day of ever–increasing federal health and safety regulation, it is especially important that we view encroachments upon individual privacy with exacting scrutiny. Blanket application of this type of regulation to businesses large and small demands that we carefully avoid the trampling under of the rights of those whose expectation of privacy in their enterprises may be real and substantial.

In view of our disposition, we find it unnecessary to reach the question of the

3. We do not need to decide whether an employer with no employees is covered by the Act. Assuming that such an employer is covered by the Act, a warrant is necessary.

4. We emphasize that our decision does not purport to remove Wait's quarry from the purview of the 1977 Act, nor do we mean to imply that federal mining inspections are forever barred from setting foot on Wait's property.

Inspections conducted pursuant to warrant or based upon another applicable exception to the warrant requirement may lawfully be conducted. Nothing said here would prevent inspectors, for example, from making plain view inspections from a vantage point outside of Wait's quarry. See *Air Pollution Variance Board v. Western Alfalfa*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974).

impact of Wait's enterprise upon interstate commerce.

The order of the court below is REVERSED.